**HEWLETT–PACKARD COMPANY,**
**Plaintiff,**

v.

**GENRAD, INC., Defendant.**

**Civ. A. No. 94–10675–RCL.**

United States District Court,
D. Massachusetts.

Feb. 10, 1995.

---

William W. Cochran, Hewlett–Packard Co., Palo Alto, CA, Edmond R. Bannon, Jonathan A. Marshall, John J. Lauter, Frank E. Morris, Lori S. Gentile, Walter E. Stalzer, Pennie & Edmonds, New York City, Kevin P. Light, Nicholas J. Nesgos, Choate, Hall & Stewart, Boston, MA, Mary Scherchel Brady, George B. Curtis, Gibson, Dunn & Crucher, Denver, CO, William H. MacAllister, Hewlett–Packard Co., Boise, ID, for plaintiff.

Joseph H. Born, Thomas C. O'Konski, Cesari & McKenna, Boston, MA, Robert Paul Detrick, Holland & Hart, Denver, CO, for defendant.

*ORDER RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (DOCKET ENTRY # 20); MOTION BY PLAINTIFF HEWLETT–PACKARD TO DISMISS, IN PART, DEFENDANT'S FIRST COUNTERCLAIM AS TO U.S. PATENT NO. 5,124,660 (DOCKET ENTRY # 7); MOTION BY PLAINTIFF HEWLETT–PACKARD UNDER FEDERAL RULE 42(b) FOR A SEPARATE TRIAL, IF NECESSARY, ON THE ANTITRUST, UNFAIR COMPETITION AND PATENT MISUSE ISSUES AND TO STAY DISCOVERY OF THESE ISSUES (DOCKET ENTRY # 11); MOTION BY DEFENDANT, GENRAD, INC., UNDER FEDERAL RULE 42(b) FOR A SEPARATE TRIAL ON THE ISSUE OF DAMAGES AND TO STAY DISCOVERY CONCERNING DAMAGES, PENDING THE ADJUDICATION OF LIABILITY (DOCKET ENTRY # 55)*

BOWLER, United States Magistrate Judge.

Plaintiff Hewlett–Packard Company ("HP") moves for a preliminary injunction (Docket Entry # 20) and to dismiss a counterclaim filed by defendant GenRad, Inc. ("GenRad") (Docket Entry # 7). GenRad opposes both motions (Docket Entry # # 14, 15, 33 & 40) and moves for a separate trial on the issue of damages (Docket Entry # 55). After conducting hearings (Docket Entry

# # # 45, 49, 58), this court took the motions (Docket Entry # # 7, 20 & 55) under advisement. This Order also addresses HP's motion for a separate trial on the issues of antitrust, unfair competition and patent misuse. (Docket Entry # 11)

## BACKGROUND

HP filed an amended complaint against GenRad alleging GenRad's infringement of U.S. Patent No. 5,254,953 ("the '953 patent"), issued by the United States Patent and Trademark Office ("PTO") on October 19, 1993.[1] (Docket Entry # 2). Entitled Identification of Pin–Open Faults By Capacitive Coupling Through The Integrated Circuit Package, the '953 patent generally involves a system to determine whether the input and output pins of circuit board components are properly soldered to a printed circuit board. HP maintains that GenRad's Opens Xpress product infringes its TestJet product protected by the '953 patent. It therefore moves to preliminarily enjoin GenRad from selling Opens Xpress. (Docket Entry # 20).

GenRad filed an answer and three counterclaims including, *inter alia,* a counterclaim seeking a declaratory judgment of the invalidity, unenforceability and noninfringement of the '660 patent. (Docket Entry # 3, First Counterclaim). HP seeks to dismiss this counterclaim on the basis of a nonjusticiable controversy. (Docket Entry # 7).

## I. PLAINTIFF'S MOTION FOR A PRE-LIMINARY INJUNCTION (DOCKET ENTRY # 20)

HP claims that its '953 patent is valid and infringed by GenRad's Opens Xpress product. GenRad submits a number of arguments based on the prior art, HP's alleged inequitable conduct with the PTO and noninfringement. Because the latter argument is both persuasive and dispositive of the issue of reasonable likelihood of success, this court summarizes the relevant facts pertaining thereto.

Kevin W. Keirn ("Keirn"), an engineer in HP's research and development laboratory in Loveland, Colorado and one of the three named inventors of the '953 patent, avers that Opens Xpress infringes each element of claims 1, 2, 3, 5 and 6 of the '953 patent. (Docket Entry # 22, ¶ 18). Claims 2, 3, 5 and 6 incorporate the system claimed in claim 1. Therefore, a finding of noninfringement with regard to claim 1 necessarily leads to a finding of noninfringement of claims 2, 3, 5 and 6.

Inasmuch as the claim language is critical in assessing infringement, claim 1 of the '953 patent claims the following:

1. A system for measuring the integrity of an electrical contact between an electrical connection pin of an electrical component and a first node of a circuit assembly, said system comprising:

(a) signal supplying means, comprising an output and a common signal return, for supplying an electrical current via said output to a pin of said electrical component;

(b) an electrical connection between a second node of the circuit assembly and said common signal return of said signal supplying means;

(c) a conductive electrode comprising a surface adapted to be placed in a fixed position in proximity to a surface of said pin; and

(d) measuring means, operatively coupled to said conductive electrode, for measuring a parameter indicative of a capacitance associated with connection of said pin to said circuit assembly, said capacitance being indicative of the integrity of the electrical connection between said pin and said circuit assembly.

(Docket Entry # 22, Ex. A).

The '953 patent which protects HP's TestJet product depicts a method for testing for open circuits in a circuit assembly after the electrical components of the assembly have been soldered onto a printed circuit board. (Docket Entry # 22, ¶¶ 5 & 10). Open circuits or opens are faulty connections between

---

1. HP's original complaint contained an allegation of infringement against GenRad as to U.S. Patent No. 5,124,660 ("the '660 patent"). Gen-

Rad describes the '953 patent as a continuation in part of the '660 patent.

electrical component pins and electrical conductors, described as traces in the '953 patent. (Docket Entry # 22, ¶¶ 5 & 9).

The '953 patent accomplishes such testing through a technique known as in-circuit testing. Both Opens Xpress and TestJet employ this testing method. (Docket Entry # 22, ¶ 6).

In in-circuit testing, a tester connects below a bed of nails fixture which connects to the underside of a circuit board. The upper portion of the bed of nails fixture contacts traces on the circuit board which connect to pins of the electrical components mounted on the circuit board.[2] (Docket Entry # 22, ¶ 6). The tester sends power to the individual component being tested through the nails and the traces. More specifically, the tester electronically stimulates input pins of the component, detects the response at the output pins of the component and measures the response in comparison to an expected response of a properly connected component. (Docket Entry # 22, ¶¶ 6–7).

As an in-circuit testing method, the '953 patent provides a means to test the connection of a pin to the printed circuit board by employing a capacitative coupling measurement. Claim 1(d) of the '953 patent describes the measuring means as "operatively coupled to" the conductive electrode described in claim 1(c) which measures "a parameter indicative of a capacitance associated with [the] connection of [the] pin to [the] circuit assembly." (Docket Entry # 22, ¶ 10 & Ex. A).

Figure 1 in the '953 patent diagrams the pathway of the capacitative coupling. (Docket Entry # 22, ¶ 10 & Ex. A; Docket Entry # 33, Johnson Declaration, ¶ 5). Figure 1 schematically illustrates a testing of the connection (118) of a pin (112) to the component (110). Referring to Figure 1, and as described in the specification, an oscillator voltage is applied by an oscillator (104) to a trace (114) on the circuit assembly which attaches to the pin being tested (112). Through capacitative coupling, the current passes from the pin (112) to a conductive electrode (106) and

then to a current measuring device (116). If the measured current falls between certain predetermined limits, then the pin (112) is properly connected to the component (110) at the location being tested (118). Otherwise, there is a faulty connection. (Docket Entry # 22, ¶ 10 & Ex. A; Docket Entry # 33, Johnson Declaration, ¶ 5).

The integrity of the capacitance measurement noted in claim 1(d) is "guarded" from stray capacitance in the printed circuit board by connecting these power connections to a common signal return. (Docket Entry # 22, Ex. A, Column 5). While the '953 patent does not use the term "guarded" or "guarding," Paul H. Bardell ("Bardell") attests on behalf of HP that, "The requirement in Claim 1 of the '953 patent for attachment of a second node to the common signal return of the signal source is another common form of guarding." (Bardell Declaration, No Docket Entry No. Assigned; see also Supplemental Declaration of Keirn, ¶ 3, No Docket Entry No. Assigned). Similarly, Kenneth L. Johnson ("Johnson") avers on behalf of GenRad that connecting other pins to the common signal return is commonly known as guarding. (Docket Entry # 33, Johnson Declaration, ¶ 8).

Referring to Figure 1 in the '953 patent, Johnson describes the existence and effect of these stray capacitances on the integrity of the measurement of the connection being tested. He declares that there are stray capacitances:

between the trace 114 and other traces on the circuit board and between the various pins 120, 122 etc. of the component package 110, as well as internal capacitances in the component, all of which provide paths for capacitative current from the trace 114 to the electrode 106 even in the absence of a valid connection 118. Thus there is a significant current through the electrode 114 and current measuring device 116 and it is therefore difficult to distinguish between a good connection and a bad connection. The connection of the pin 120 to the

2. The specification of the '953 patent describes a connection "made, through a bed of nails fixture, to a printed circuit board wiring trace that con-

nects to the component pin being tested." (Docket Entry # 22, Ex. A, Col. 3).

common signal return materially reduces the current through these stray capacitances and thus reduces the current through the current measuring device when there is a bad connection. (Docket Entry # 33, Johnson Declaration, ¶ 7).

The common signal return is claimed as an element of the '953 patent in claim 1(b).[3] As noted *supra*, the language of this element of claim 1 expressly describes "an electrical connection between a second node of the circuit assembly and said common signal return of said signal supplying means," commonly known as guarding. (Docket Entry # 22, Ex. A).

In comparing the features of Opens Xpress to TestJet on a chart, Keirn initially states that, "Just as in TestJet, at least one other pin of the [integrated circuit] is connected to the common signal return indicated by the ground signal [ ]." (Docket Entry # 22, ¶ 16 & Ex. I). He concludes that Opens Xpress incorporates each element of claim 1 of the '953 patent.[4] (Docket Entry # 22, ¶ 18).

After GenRad's submission of Blumenau's declaration, Keirn forthrightly acknowledges that the current version of Opens Xpress does not literally infringe claim 1(b) of the '953. He avers that, "[E]very element of claim 1 of the '953 patent is exactly found in the 'current version' of the Opens Xpress product, except for claim element (b), namely, an electrical connection between a second node of the circuit assembly and the common signal return of the signal supplying

means."[5] Bardell similarly recognizes that Opens Xpress does not literally infringe element (b) of claim 1. (Supplemental Declaration of Keirn, ¶ 4, No Docket Entry No. Assigned; Bardell Declaration, ¶ 26, No Docket Entry No. Assigned).

Blumenau explains that the current version of Opens Xpress "does not ground any node on the board under test." Stated otherwise, the current version of Opens Xpress does not connect a second node to the common signal return. (Docket Entry # 33, Blumenau Declaration, ¶ 3). Rather, referring to a diagram of the current version of Opens Xpress, Blumenau avers that the second pin (22) on the component (16) receives output from an amplifier (10) which guards the capacitance measurement of the pin being tested (18). (Docket Entry # 33, Blumenau Declaration, ¶ 4 & Ex. A). The amplifier carries the same signal as the capacitative probe[6] (Docket Entry # 33, Blumenau Declaration, ¶ 4) resulting in zero current flowing through the path (Docket Entry # 76, Supplemental Declaration of Nikolai, ¶ 12). Thus, as expressed by HP's expert, instead of being connected to the common signal return, the second pin (22) connects to the signal from the capacitative probe which is transmitted through the amplifier. (Bardell Declaration, ¶ 26, No Docket Entry No. Assigned). The method thereby isolates or guards the pin being tested (18) in order to ensure an accurate measurement.[7] (Docket Entry # 76, Wedlock Declaration, ¶ 15).

3. Keirn, one of the three inventors, avers that "the feature of a connection between a second node of the circuit assembly and the common signal return ... is but one element of the claimed invention." It is therefore apparent that claim 1(b) is an element of claim 1 of the '953 patent. (Supplemental Declaration of Keirn, ¶ 3, No Docket Entry No. Assigned)

4. In his first declaration, Keirn based his knowledge of Opens Xpress on a GenRad news release, a two page article by GenRad's Director of Sales Programs, an undated, one page article describing Opens Xpress, a lengthy users guide for the product and a sales brochure. (Docket Entry # 22, ¶ 15 & Ex. C–G). As such, Keirn's initial averments vis-a-vis the Opens Xpress product are less worthy of credence than GenRad's engineer, Steven Blumenau ("Blumenau"), who avers his familiarity with the current version of GenRad's

Opens Xpress (Docket Entry # 33, Blumenau Declaration).

5. HP therefore seeks to rely on the doctrine of equivalents for finding a reasonable likelihood of infringement.

6. A capacitative probe is a non-contact probe. Using a non-contact probe to detect an open circuit rather than using a direct contact probe increases the level of interference from parallel paths during a test. (Docket Entry # 76, Wedlock Declaration, ¶¶ 8–11).

7. Bardell attempts to equate the two techniques by noting that the Opens Xpress product uses the active form of guarding while claim 1 of the '953 patent simply depicts the passive form of guarding. (Bardell Declaration, ¶ 27, No Docket Entry No. Assigned).

Keirn states that the function of the connection between the second node and the common signal return noted in claim 1(b) "is to isolate any signal capacitatively coupled between the lead frame of the pin under test and the electrode." (Supplemental Declaration of Keirn, ¶ 5, No Docket Entry No. Assigned). Keirn and Bardell aver that the function of the connection between the second node and the electrode in the current version of Opens Xpress is to isolate the pin under test or, otherwise stated, to isolate any signal capacitatively coupled between the lead frame of the pin under test (18) and the electrode (12). (Supplemental Declaration of Keirn, ¶ 5, No Docket Entry No. Assigned; Bardell Declaration, ¶ 27, No Docket Entry No. Assigned).

Keirn further attests that the connection between the second node and the common signal return in claim 1 of the '953 patent and the connection between the second node and the electrode in the current version of Opens Xpress both accomplish this function of isolation "by discouraging any signal from capacitatively coupling between the lead frame of" the pin under test and the electrode.[8] (Supplemental Declaration of Keirn, ¶ 5, No Docket Entry No. Assigned).

As to the result, Bardell avers that the result in either situation "is that the measurement of the signal from the capacitive probe electrode [is] indicative of whether or not the pin under test is connected to its trace on the circuit board." (Bardell Declaration, ¶ 27, No Docket Entry No. Assigned). Keirn similarly depicts, albeit less cogently, that the result in both claim 1(b) and the current version of Opens Xpress "is the same—that the difference between the value of the parameter measured by the measuring means when the pin under test is properly connected to its trace on the circuit board and when it is not, will be meaningful in determining whether or not the pin is properly connected to its trace." (Supplemental

Declaration of Keirn, ¶ 5, No Docket Entry No. Assigned).

Keirn therefore surmises that connecting the second node to the common signal return in claim 1(b) of the '953 patent and connecting the second node through an amplifier to the electrode in the current version of Opens Xpress "are technically equivalent forms of guarding." (Supplemental Declaration of Keirn, ¶ 6, No Docket Entry No. Assigned). Bardell similarly concludes that the guarding arrangement of the current version of Opens Xpress performs the same function in substantially the same way to achieve the same result as the attachment of a second node to the common signal return in the claimed invention. (Docket Entry # 39, Bardell Declaration, ¶ 27).

In contrast, GenRad submits evidence that the claimed element and the current version of Opens Xpress perform differing functions in different ways to achieve the same end result, an end result which differs from that described by Keirn and Bardell. Bruce D. Wedlock ("Wedlock"), a professor and lecturer of electrical engineering for the past 37 years, avers that the function of the current version of Opens Xpress is to "impress upon the 'second nodes' the capacitative probe signal, not the common-signal-return potential." (Docket Entry # 76, Wedlock Declaration, ¶ 16). The function of the claim element in question, however, is "to maintain the 'second nodes' at the potential of the 'common signal return.'" (Docket Entry # 76, Wedlock Declaration, ¶ 16).

Claim 1(b) performs the function of maintaining the second nodes at the potential of the common signal return by connecting the second nodes to the common signal return or, stated otherwise, impressing the voltage of the common signal return on the second nodes. (Docket Entry # 76, Declaration of Wedlock, ¶¶ 15–16; Docket Entry # 76, Supplemental Declaration of Nikolai, ¶ 12). In comparison, the current version of Opens Xpress performs the function of impressing

---

8. Keirn refers to the item designated by the number 12 as a conductive electrode. He also refers to a second node at pin 22. (Supplemental Declaration of Keirn, ¶ 5, No Docket Entry No. Assigned). Nikolai refers to electrical component pins as corresponding to "nodes" in the '953 patent. (Docket Entry # 33, Nikolai Declaration, ¶ 14). Blumenau refers to the item designated by the number 12 interchangeably as a capacitative probe and as the circuit board. (Docket Entry # 33, Blumenau Declaration). These discrepancies do not alter this court's conclusions.

the capacitative probe signal on the second nodes by using an amplifier to actively drive the second nodes, rather than by connecting such nodes to the ·common signal return. An oscilloscope illustrates the differing ways in which the claimed element and the current version of Opens Xpress perform their respective functions. In the claimed element, an oscilloscope would display the second node signal as a flat, horizontal line representing an unchanging level, usually zero. In the current version of Opens Xpress, an oscilloscope would reflect the second node signal "as a sine wave, indicating that the signal on the 'second nodes' is a sinusoidally varying voltage." (Docket Entry # 76, Declaration of Wedlock, ¶ 15–16; Docket Entry # 76, Supplemental Declaration of Nikolai, ¶ 12).

Wedlock and Nikolai further attest that the result of both the claimed element and the current version of Opens Xpress is to guard the capacitance measurement or, in other words, to prevent parallel paths from interfering with the capacitative measurement. (Docket Entry # 76, Declaration of Wedlock, ¶¶ 3 & 15–16; Docket Entry # 76, Supplemental Declaration of Nikolai, ¶ 12).

### DISCUSSION

 The standard for issuing a preliminary injunction in a patent infringement action requires weighing and measuring the following factors: (1) a reasonable likelihood of success on the merits; (2) the threat of irreparable harm *pendente lite* in the absence of a preliminary injunction; (3) the balance between this harm and the harm that issuance of a preliminary injunction will cause to other parties; and (4) the public interest. *Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed.Cir.1991); *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed.Cir.1988); *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed. Cir.1987). Inasmuch as the issuance of a preliminary injunction in a patent case involves substantive matters, the law of the Federal Circuit establishes the applicable

standard. *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d at 1451 n. 12.

 The burden is on HP, the movant, to establish its entitlement to a preliminary injunction. *Reebok International Limited v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir. 1994). Moreover, the movant is required to establish the first two factors (reasonable likelihood of success and irreparable harm) in order for a court to issue a preliminary injunction. *Reebok International Limited v. J. Baker, Inc.*, 32 F.3d at 1556.

### A. *Reasonable Likelihood of Success*

 The patentee, HP, carries the burden of showing a reasonable likelihood of success on the merits with regard to validity and infringement.[9] *Reebok International Limited v. J. Baker, Inc.*, 32 F.3d at 1555–1556 ("movant ... must establish a reasonable likelihood of success on the merits both with respect to validity and infringement of its patent"); *Nutrition 21 v. United States*, 930 F.2d at 869. HP need not establish infringement "beyond all question, or that there [is] no evidence supporting the viewpoint of [GenRad]." *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d at 390. Rather, the issue turns on the reasonable likelihood that HP will meet its burden at trial of showing the infringement of its TestJet product by GenRad's Opens Xpress product. *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d at 390.

"To establish infringement, every limitation set forth in a patent claim must be found in an accused product or process or by a substantial equivalent." *Laitram Corporation v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir.1991); *accord Valmont Industries, Inc. v. Reinke Manufacturing Company, Inc.*, 983 F.2d 1039, 1043 n. 2 (Fed.Cir.1993) (if "accused device lacks any limitation or an equivalent, it does not infringe the claim"). Consequently, if the claim limitation set forth in claim 1(b) is missing from the Opens Xpress product, there can be no infringement, *London v. Carson Pirie Scott & Company*, 946 F.2d 1534, 1539 (Fed.Cir.1991),

9. This opinion addresses infringement and, inasmuch as HP fails to establish a reasonable likelihood of success as to infringement, this court

need not address the issue of validity. Rather, this court will assume, *arguendo* for this opinion *only*, that HP establishes validity.

and, hence, no reasonable likelihood of success as to infringement. In addition, because claims 2, 3, 5 and 6 incorporate the system claimed in claim 1, a finding that HP is not reasonably likely to establish infringement of an element in claim 1 leads to the same finding with respect to claims 2, 3, 5 and 6. *See Wahpeton Canvas Company, Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed. Cir.1989) (one who does not infringe independent claim cannot infringe dependent claims). Infringement as to claim 1 therefore forms the crux of the issue of HP's reasonable likelihood of success on the merits as to infringement.

With regard to infringement, the parties primarily, albeit not exclusively (Docket Entry # 22 & Ex. I; Docket Entry # 21, pp. 6–7 & 11–12; Docket Entry # 74, p. 4), address whether certain features of the Opens Xpress product infringe claim 1(b) of the '953 patent. Accordingly, this court will assume, *solely* for purposes of this Order, that, with the exception of claim 1(b), the current version of Opens Xpress [10] infringes the TestJet product which is protected by the '953 patent.

■ Determining infringement is a two step process. The court first interprets the scope of the claim and then determines whether the accused device falls within the scope of the properly construed claim. *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*, 16 F.3d 394, 3967 (Fed.Cir.1994). Claims are "interpreted in light of the claim language, the specification, and the prosecution history." *Intel Corporation v. United States International Trade Commission*, 946

F.2d 821, 835 (Fed.Cir.1991); *accord McGill, Inc. v. John Zink Company*, 736 F.2d 666, 673–5 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984) (recognizing that "[p]rosecution history may be used not only in an estoppel context but also as a claim construction tool").

■ The plain language of claim 1(b) expresses the limitation of "an electrical connection between a second node of the circuit assembly and said common signal return of said signal supplying means." The requirement in claim 1(b) of an electrical connection between a second node of the circuit assembly and the common signal return is an element of claims 1, 2, 3, 5 and 6 of the '953 patent. (Bardell Declaration, ¶ 14, No Docket Entry No. Assigned).

The specification explains that the limitation set forth in claim 1(b) expresses a means to avoid the problem of stray capacitances interfering with the measurement of the pin under test. The specification details at length the problem of stray capacitances and provides a figure illustrating the effects of such stray capacitances. (Docket Entry # 22, Ex. A, col. 4, 1. 19–col. 5, 1. 43; col 5, 1. 57–66; Fig. 7). In addition, the specification repeatedly states that the second nodes should be connected to the common signal return. (Docket Entry # 22, Ex. A, col. 3, 1. 68–col. 4, 1. 2; col. 5, 1. 15–18 & 31–34; col. 8, 1. 57–60).

The prosecution history of the '953 patent demonstrates that HP carefully distinguished the prior art disclosed in a British patent by Rignall ("Rignall").[11] The June 1992 applica-

---

10. Presently, GenRad markets a version of Opens Xpress that does not ground any node on the circuit board under test. (Docket Entry # 33, Blumenau Declaration, ¶ 3). A preliminary injunction looks to enjoin future activity of an alleged infringer. It is the current product marketed by GenRad which would be subject to a preliminary injunction. Hence, this court is concerned primarily with whether the current version of Opens Xpress infringes TestJet and whether to enjoin GenRad from further marketing of this product in the event of such infringement.

Moreover, HP fails to show that GenRad continues to market and sell its former version of Opens Xpress. In fact, GenRad establishes that it presently markets the current version of Opens Express which rebuts any presumption of irrepa-

rable harm to HP with regard to the former version of Opens Xpress. *See, e.g., Reebok International Limited v. J. Baker, Inc.*, 32 F.3d at 1557 (implied finding that movant failed to establish the number of sales of infringing product was more than *de minimis* supported overcoming assumed presumption of irreparable harm).

11. The prosecution history of the '660 patent reveals that the PTO initially rejected claims 1 through 4 and 9 through 11 of the '660 patent in September 1991 as unpatentable over the Rignall patent in view of U.S. Patent No. 4,779,041 by Williamson and U.S. Patent No. 4,789,829 by Stribling. (Docket Entry # 24, Ex. A). Rignall generally discloses a capacitive method for checking connections in a printed circuit board. The initial application for the '600 patent

tion for the '953 patent acknowledges the prior art of Rignall as divulging a means for connection verification through capacitative coupling. (Docket Entry # 24, Ex. B). The application, as does the specification, notes that Rignall does not provide "a means for connecting at least one other pin to the common signal return." (Docket Entry # 24, Ex. B). The application further notes that Rignall does not suggest applying his technique to circuit assemblies already loaded with components because of the problem of stray capacitances. Connecting these common power connections to the common signal return, however, avoids the disadvantages of Rignall's approach.[12] (Docket Entry # 24, Ex. B).

The specification as ultimately issued in the '953 patent likewise explains that Rignall does not suggest using his technique on printed circuit boards already loaded with components because of the large problem of stray capacitances. (Docket Entry # 22, Ex. A, col. 5, 1. 55–62). The pertinent provision of the specification reads that Rignall:

does not suggest applying his technique to verification of circuit assemblies already loaded with components. If one tries to apply Rignall's technique to the problem of open component lead connections, one quickly is faced with the problem of stray capacitances supplied by both the printed circuit board and the internal capacitances of the component itself.

The present invention avoids the disadvantages of Rignall's approach *by connect-*

*ing those troublesome common power connections to the common signal return lead.* (Docket Entry # 22, Ex. A) (emphasis added).

As demonstrated by the plain language of claim 1(b), the specification and prosecution history, the scope of claim 1(b) therefore encompasses and requires connecting the second nodes to the common signal return. Further, the overall purpose of such connections to the common signal return is to address the problem of stray capacitances.

It is undisputed that the current version of Opens Xpress does not include connecting the second nodes to the common signal return. Thus, it does not literally infringe claim 1(b). HP therefore argues infringement under the doctrine of equivalents. (Docket Entry # 74).

 The scope of patent protection as defined in the claims of a patent remains the same under the doctrine of equivalents. *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.,* 16 F.3d at 398. The previous discussion is therefore pertinent to this court's analysis of the doctrine of equivalents. Limitations applicable to literal infringement may also apply under the doctrine of equivalents. *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.,* 16 F.3d at 398.

 The doctrine is an exception and not the rule. *London v. Carson Pirie Scott & Company,* 946 F.2d at 1538. Nor is the doctrine a license to disregard claim limitations. *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.,* 16 F.3d at 398. Rather, it

claimed a system for testing electrical components to determine if the pins are properly connected to a circuit through the use of: (1) a signal supplying means; (2) a conductive electrode connected to an output of the signal supplying means; (3) a current measuring means between the circuit and the connection; and (4) a means to detect open pin faults. (Docket Entry # 24, Ex. A). The examiner deemed that it would have been obvious to one skilled in the art to recognize that the capacitive coupling of Rignall could be used in an integrated circuit package already mounted on a printed circuit board. (Docket Entry # 24, Ex. A).

Responding to the initial denial, HP canceled claims 1 through 4 and 9 through 11 and added claims 12 through 18 which the PTO renumbered as claims 5 through 11 of the '660 patent. (Docket Entry # 24, Ex. A). In December 1991

the PTO allowed the amended application which issued as the '660 patent. (Docket Entry # 24, Ex. A). In light of the previous rejection, HP was careful to distinguish Rignall in the course of applying for the '953 patent. (Docket Entry # 22, Ex. A; Docket Entry # 33, Wedlock Declaration, ¶ 10).

12. The examiner did not discuss the Rignall patent in the course of initially rejecting claims 1 through 21 in HP's initial application for the '953 patent. The examiner rejected the above claims as either being anticipated by Fitchtenbaum, inventor of U.S. Patent No. 4,186,338, under 35 U.S.C. § 102(b) or being unpatentable over Fitchtenbaum under 35 U.S.C. § 103. (Docket Entry # 24, Ex. B).

is an equitable doctrine, *London v. Carson Pirie Scott & Company*, 946 F.2d at 1538, which expands the patentee's right to exclude from the marketplace an infringer who merely makes insubstantial changes to the claimed invention. *Valmont Industries, Inc. v. Reinke Manufacturing Company, Inc.*, 983 F.2d at 1043; *see, e.g., Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1261 (Fed.Cir.1989) (simply exchanging known, equivalent ingredient in order to avoid the literal language of a patent presents "classic example" of doctrine of equivalents).

■ The doctrine of equivalents involves a factual determination, *Intel Corporation v. United States International Trade Commission*, 946 F.2d at 832, consisting of a three part inquiry. The doctrine entails ascertaining whether the accused device, Opens Xpress as presently marketed, and the claimed invention, TestJet, perform "substantially the same function in substantially the same way to obtain the same result." *Perkin–Elmer Corporation v. Westinghouse Electric Corporation*, 822 F.2d 1528, 1535 (Fed.Cir.1987).[13] Whether a person of ordinary skill in the art would have perceived "the interchangeability of the claimed and unclaimed elements is a factor in considering equivalence." *Perkin–Elmer Corporation v. Westinghouse Electric Corporation*, 822 F.2d at 1535.

The first inquiry is to define the function of "an electrical connection between a second node of the circuit assembly and said common signal return of said signal supplying means" and then to determine whether Opens Xpress performs substantially the same overall function. As detailed *supra*, HP and GenRad provide different definitions of the function of claim 1(b). HP provides a more global definition which, according to Keirn, is to isolate any signal capacitatively coupled between the lead frame of the pin under test and the electrode, or, according to Bardell, to prevent stray electrical signals in order to isolate the pin under test. This definition, as persuasively explained by Wed-

lock, however, is more akin to the overall result of claim 1(b).

The function of an electrical connection of a second node to the common signal return is to isolate or maintain the node at the potential of the common signal return and thereby achieve the overall result of guarding against stray capacitances. Claim 1(b) performs this function by connecting the second nodes to the common signal return. The plain language and the specification's repeated references to the common signal return demonstrate that the connection to a common signal return forms an integral part of claim 1(b).

In contrast, Opens Xpress performs the function of maintaining the second nodes by impressing upon them the capacitative probe signal. Even more significantly, Opens Xpress accomplishes this function in a substantially different manner than claim 1(b). Opens Xpress does not employ a common signal return. Instead, it uses an amplifier to impress upon the second nodes the capacitative probe signal. The second nodes are actively driven in Opens Xpress and on an oscilloscope reflect as a sine wave. In claim 1(b), the second nodes are connected to the common signal return yielding a flat, horizontal line on an oscilloscope. These two ways of achieving the result of guarding the capacitance measurement (or, stated otherwise, the result of preventing parallel paths from interfering with the measurement of the pin under test) are significantly different. GenRad's use of an amplifier to impress upon the second nodes the capacitative probe signal is neither insignificant nor insubstantial.

The overall result or purpose of connecting the second nodes to the common signal return is to address the problem of stray capacitances and thereby prevent parallel paths from interfering with the measurement of the pin under test. The specification details the problem of stray capacitances and the deficiencies of Rignall's teachings. Similarly, Opens Xpress achieves substantially the same overall result of preventing interference from parallel paths thereby guarding the integrity of the capacitance measurement.

13. The tripartite function/way/result equivalency analysis, however, is not the only way to establish equivalency. *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1326 (Fed.Cir.1991).

Nevertheless, because Opens Xpress operates with an amplifier to impress upon the second nodes the capacitive probe signal it performs or works in a substantially different way than connecting the second nodes to the common signal return as depicted in claim 1(b). In sum, HP fails to show a reasonable likelihood of success that Opens Xpress performs the same overall function in substantially the same way as the claimed invention.[14] Therefore, HP is not reasonably likely to succeed in establishing infringement under the doctrine of equivalents vis-a-vis claim 1(b) and the current version of Opens Xpress.[15]

### B. *Irreparable Harm*

■ For reasons stated in part A, this court does not find a "clear showing" of patent infringement as to the current version of Opens Xpress.[16] Consequently, the presumption of irreparable harm that arises "when a patentee 'clearly shows' that his patent is valid and infringed," *Atlas Powder Company v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985); *accord H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d at 390 ("irreparable harm has been presumed when a clear showing has been made of patent validity and infringement"), does not arise in the case at bar. *See Nutrition 21 v. United States,* 930 F.2d at 871 ("without a clear showing of validity and infringement, a *presumption* of irreparable harm does not arise").

Monetary relief, however, is oftentimes insufficient to preserve the legal interests of the parties. *Atlas Powder Company v. Ireco Chemicals,* 773 F.2d at 1233. Although "there is no *presumption* that money damages will be inadequate," *Nutrition 21 v. United States,* 930 F.2d at 872, "the principal value of a patent is its statutory right to exclude" which "weighs against holding that monetary damages will always suffice." *Reebok International Limited v. J. Baker, Inc.,* 32 F.3d at 1557.

In seeking to establish irreparable harm, HP contends that: (1) it will be impossible to measure in monetary terms the extent of HP's lost business; (2) the fleeting nature of the circuit board testing market will deprive HP of the opportunity to gain market share; (3) HP will irretrievably lose "consumer pull" associated with offering a unique product; and (4) GenRad's precarious financial condition will result in its inability to pay monetary damages. (Docket Entry # # 21 & 74).

With regard to the first and fourth arguments, this court disagrees. HP has licensed its TestJet technology and thereby placed a monetary value on agreements to sell such technology. (Docket Entry # 23, ¶ 11). Further, HP emphasizes that due to GenRad placing Opens Xpress on the market, GenRad customers are now unlikely to incur the increased costs associated to switch to HP board testers. David Kent ("Kent"), HP's

---

**14.** This court expressly does *not* find that HP has failed to establish sufficient evidence of equivalence as to each of the three subparts of equivalence. HP presents evidence through Keirn and Bardell which may indeed raise a factual issue. *See Pfaff v. Wells Electronics, Inc.,* 5 F.3d 514, 519 (Fed.Cir.1993) (court improperly resolved factual issue pertaining to doctrine of equivalents); *see also Malta v. Schulmerich Carillons, Inc.,* 952 F.2d 1320 (Fed.Cir.1991) (concurrence) (interpreting *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan,* 873 F.2d 1422, 1425–1426 (Fed. Cir.1989), as requiring patentee present substantial evidence comparing each of the three subparts to survive motion for directed verdict), *reh'g denied,* 959 F.2d 923 (Fed.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992). Findings contained in this Order concern the overriding issue of whether HP has a reasonable likelihood of success on the merits in establishing the tripartite doctrine of equivalents.

**15.** In light of this finding and as explained in a previous footnote, this court need not address GenRad's arguments that HP is not reasonably likely to succeed on the merits due to invalidity and unenforceability based on prior art and inequitable conduct.

**16.** As also explained in a previous footnote, GenRad adequately rebuts any presumption of irreparable harm which arises as to the former version of Opens Xpress. Not only can past sales of this product be measured in monetary terms, but the number of future sales to enjoin appears *de minimis.* Similar to the circumstances in *Reebok International Limited v. J. Baker, Inc.,* 32 F.3d at 1557–1558 (affirming lower court finding of lack of irreparable harm), where the plaintiff had discontinued producing the product model purportedly infringed, GenRad established that it no longer actively markets the former version of Opens Xpress.

Worldwide Business Development Manager in HP's Manufacturing Test Division, avers that since GenRad's introduction of Opens Xpress, GenRad customers no longer telephone HP to inquire about the TestJet product. Kent also states that HP will continue to lose circuit board tester sales to GenRad. (Docket Entry # 23, ¶¶ 13 & 15). Such lost sales, however, may be estimated by calculating GenRad's sales of Opens Xpress during this time period and reasonably estimating the future revenue and business resulting from such sales. *See Nutrition 21 v. United States,* 930 F.2d at 871 (mere difficulty in calculating market share losses does not justify injunction inasmuch as such losses "would apply in every patent case where the patentee practices the invention").

As to the fourth argument, although it is true that GenRad reported negative earnings from 1985 to 1993 (Docket Entry # 24, Ex. C & D), HP acknowledges that GenRad was a leading producer of circuit board testers in 1992 occupying an estimated 20% of the worldwide market (Docket Entry # 23, ¶ 5). GenRad's Chief Financial Officer attests that the company reported profits in the fourth quarter of 1993 and the first quarter of 1994 and projects profits for the remainder of 1994. (Docket Entry # 33, Aldworth Declaration). Consequently, while GenRad's financial condition is far from superlative, it is not in a financial condition similar to that of the defendant in *Eli Lilly & Company v. Premo Pharmaceutical Laboratories,* 630 F.2d 120, 137 (3rd Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980) (finding irreparable harm given the defendant's Chapter XI reorganization in 1973, small profits in 1978 and four pending lawsuits against the defendant for patent infringement).

On the other hand, it appears that the fleeting nature of the circuit board tester market will likely curtail the useful life of the invention protected under the '953 patent. Keirn avers that in the next few years circuit boards will no longer have sufficient room to use the bed of nails fixture. (Docket Entry # 22, ¶ 22). Similarly, Kent believes that HP's opportunity to gain market share in the circuit board tester market because of "Te-

stJet will not last more than a few years." (Docket Entry # 23, ¶ 14). GenRad proffers little, if any, evidence to rebut these averments which case law supports as indicative of irreparable harm. *See, e.g., Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d at 1456; *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d at 391; *see also Nutrition 21 v. United States,* 930 F.2d at 872 (citing *H.H. Robertson, Co.*).

Furthermore, HP undoubtedly will continue to lose the opportunity to market a unique product during the pendency of this litigation absent a preliminary injunction. As noted by Kent (Docket Entry # 23, ¶ 16), the advantages of offering a unique product and being perceived as an innovator in the field of circuit board testing are largely intangible. The parties, however, presently have a trial date of May 15, 1995. Consequently, the advantages of offering a unique product given the short period of time in which a preliminary injunction would exist are diminished, albeit through no fault of HP which filed its preliminary injunction motion in June 1994 and its reply memorandum in July 1994.

HP bears the burden of showing irreparable harm given the absence of a presumption as to the current version of Opens Xpress. On balance and although the issue is close, HP fails to discharge its burden.

### C. *Balance of Harms*

The balance of harm consideration involves balancing the harm of denying a preliminary injunction to the moving party, HP, against the harm of issuing a preliminary injunction to the non-moving party, GenRad. *Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d at 1457; *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d at 390. HP failed to make a strong showing of a reasonable likelihood of success that the current version of Opens Xpress infringes claim 1(b) of the '953 patent. *See H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d at 390 (strength of movant's showing of likelihood of success is considered in weighing magnitude of injury to patent owner); *Atlas Powder Company v. Ireco Chemicals,* 773 F.2d at 1234. Accordingly, this court should not impart undeserved value to a patent

which is not necessarily infringed. *See H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d at 390.

In addition, GenRad would face significant inroads in its core business resulting from a preliminary injunction. The majority of Gen-Rad's revenues derive from selling and servicing circuit board testers. (Docket Entry # 33, Aldworth Declaration, ¶ 2). HP is a much larger company than GenRad. The division within HP which produces in-circuit board testers, however, receives an annual revenue comparable to the annual revenue received by GenRad. (Declaration of Robert H. Hill, No Docket Entry No. Assigned). Weighing all of the above equities, however, results in a balance tipping slightly in favor of GenRad.

### D. *Public Interest*

■ While the public interest favors protecting patent rights and the research and development which inevitably goes into the creation of such rights, *see Ortho Pharmaceutical Corporation v. Smith*, 15 U.S.P.Q.2d 1856, 1863, 1990 WL 18681 (E.D.Pa.1990), it does not favor protecting such rights from competition in the marketplace by products which do not necessarily literally or equivalently infringe the patent. The public has an interest in product availability and GenRad markets its product at a lower price that TestJet (Docket Entry # 23, ¶¶ 7 & 12). *See Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d at 1458. Hence, the public interest factor weighs more in favor of GenRad than HP.

Having considered and balanced the requisite factors and in light of HP's failure to establish a reasonable likelihood of success as to infringement and its failure to establish irreparable harm, this court declines to issue an preliminary injunction *pendente lite*.

### II. *MOTION BY PLAINTIFF HEW-LETT–PACKARD TO DISMISS, IN PART, DEFENDANT'S FIRST COUNTERCLAIM AS TO U.S. PATENT NO. 5,124,660 (DOCKET ENTRY # 7)*

HP moves to dismiss the first counterclaim, in part, filed by GenRad to the extent the counterclaim seeks a declaratory judgment regarding the validity, enforceability and infringement of the '660 patent. (Docket Entry # 7). HP argues that this court lacks jurisdiction over the counterclaim due to the absence of a case or controversy under 28 U.S.C. § 2201. (Docket Entry # # 8 & 34). GenRad contends that HP's actions create a reasonable apprehension that HP will charge it with infringement of the '660 patent. (Docket Entry # 14).

Relevant facts are as follows. In August 1993, GenRad advised HP that it was preparing to introduce an open circuit detection feature to the market and was willing to meet with HP to discuss the parties' respective rights in regard to the '660 patent. (Docket Entry # 10, Ex. A). By letter dated August 31, 1993, HP stated that it would welcome a meeting. The letter specifically references the '660 patent and directs Gen-Rad "to cease and desist from making, using or selling any product that infringes any of HP's patents." (Docket Entry # 15, Ex. A).

At a September 21, 1993 meeting between various HP and GenRad officials, GenRad explained its position of noninfringement as to the '660 patent. Notwithstanding Gen-Rad's explanation, HP, threatening "dire consequences," insisted that GenRad discontinue offering its capacitative probe product for sale as a condition to engage in further negotiations. (Docket Entry # 15, Ex. B).

In late September 1993, GenRad filed a complaint requesting a declaratory judgment regarding the validity, enforceability and noninfringement of the '660 patent, *GenRad, Inc. v. Hewlett Packard Company*, No. 93–12140–JLT. GenRad, however, refrained from serving HP with a copy of the complaint in light of the ongoing negotiations.

In October 1993, the '953 patent issued. GenRad therefore amended its complaint to seek declaratory relief with regard to the '953 patent.

Also in October 1993, HP filed the instant suit in the United States District Court for the District of Colorado ("the Colorado court"). HP's original complaint, subject to the provisions of Rule 11, Fed.R.Civ.P., charged GenRad with infringing the '660 patent as well as the '953 patent. Prior to

serving the complaint on GenRad, HP amended the complaint to omit the '660 patent infringement charge. Subsequently, the Colorado court transferred the action to the United States District Court for the District of Massachusetts on the grounds of improper venue.

In February 1994, GenRad filed a second action in this district seeking a declaratory judgment that its product does not infringe the '660 patent and the '953 patent, *GenRad, Inc. v. Hewlett–Packard Company,* No. 94–10223–RGS ("the second Massachusetts action"). After filing a counterclaim, HP moved to dismiss the second action. HP's motion to dismiss, of which this court takes judicial notice, raises the same argument and cites the same cases as HP's present motion pending before this court. GenRad's opposition similarly makes the same arguments and cites the same cases as GenRad's opposition pleading filed in this action.

By letter dated April 14, 1994, HP's counsel provided GenRad's counsel with the following assurance: "HP, through its undersigned counsel, hereby undertakes not to charge GenRad's Opens Xpress, as specifically described in the attached brochure, with infringement of the '660 patent." (Docket Entry #10, Ex. D). GenRad's reply letter advised HP that it remained concerned about HP's capability of bringing suit against GenRad on products which improve upon the Opens Xpress product described in the brochure. (Docket Entry #10, Ex. E). GenRad altered its Opens Xpress product in or around the spring of 1994. (Docket Entry #15, Ex. C).

On June 29, 1994, the court in the second Massachusetts action held a hearing on HP's motion to dismiss GenRad's counterclaim for declaratory relief with regard to the '660 patent. Counsel argued at length at the hearing. HP also made additional representations that, notwithstanding the incompleteness of the description of the GenRad product in the brochure, HP would not enforce the '660 patent against GenRad's products as known to HP.[17]

The court issued a ruling from the bench that GenRad had not met its burden of showing an actual case or controversy, relying on *Spectronics Corporation v. H.B. Fuller Company, Inc.,* 940 F.2d 631 (Fed.Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991), and *Level 1 Technologies, Inc. v. C.R. Bard, Inc.,* 839 F.Supp. 90 (D.Mass.1994). Surprisingly, while HP mentioned the June 29, 1994 decision during oral argument (Docket Entry #49), HP did not move to have GenRad's counterclaim dismissed on the basis of claim or issue preclusion.[18]

In August 1994, GenRad offered to assent to dismissing the '660 patent from this action if HP would undertake not to charge GenRad for infringement with regard to a product "that either makes a voltage measurement instead of current measurement or that takes its measurement at the capacitative probe." (Docket Entry #50). HP apparently declined the invitation.

---

**17.** This court takes judicial notice of the records of this related case.

**18.** Although there is authority for the principle that this court may raise the affirmative defenses *sua sponte, see United Home Rentals v. Texas Real Estate Commission,* 716 F.2d 324, 330 (5th Cir.), *rehearing denied,* 720 F.2d 677 (5th Cir.1983), *cert. denied,* 466 U.S. 928, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984) ("in the interest of judicial economy *res judicata* may properly be raised by a district court *sua sponte*"); *Alyeska Pipeline Service Co. v. United States,* 688 F.2d 765, 771, 231 Ct.Cl. 540 (1982), *cert. denied,* 461 U.S. 943, 103 S.Ct. 2120, 77 L.Ed.2d 1301 (1983) ("when necessary, the court may raise the question of claim or issue preclusion *sua sponte*"), this court declines to do so in light of its resolution of the issue in HP's favor. This court, however, finds the following language particularly apropos to the fact that this court is deciding an issue fully decided by another court in this district between the same parties represented by the same counsel:

"It is well to remember that *res judicata* and its offspring, collateral estoppel, are not statutory defenses; they are defenses adopted by the courts in furtherance of prompt and efficient administration of the business that comes before them. They are grounded on the theory that one litigant cannot unduly consume the time of the court at the expense of other litigants, and that, once the court has finally decided an issue, a litigant cannot demand that it be decided again."

*United States v. Sioux Nation of Indians,* 448 U.S. 371, 433, 100 S.Ct. 2716, 2750, 65 L.Ed.2d 844 (1980) (Rehnquist, J., dissenting) (quoting *Warthen v. United States,* 157 Ct.Cl. 798, 800, 1962 WL 9259 (1962)).

**1156**

## DISCUSSION

■ Under the Declaratory Judgement Act, 28 U.S.C. § 2201, in order for this court to declare the rights of the parties there must be an actual controversy between the parties which is ripe for adjudication. *Shell Oil Company v. Amoco Corporation,* 970 F.2d 885, 887 (Fed.Cir.1992). An actual case or controversy must exist at all stages of the litigation. *Grain Processing Corporation v. American Maize–Products Company,* 840 F.2d 902, 905–906 (Fed.Cir.1988); *Webb v. Southern Systems, Inc.,* 742 F.2d 1388, 1398 n. 6 (Fed.Cir.1984).

■ In patent litigation, there exists a two part test to determine the existence of an actual controversy. First, there must be "an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit." *BP Chemicals Limited v. Union Carbide Corporation,* 4 F.3d 975, 978 (Fed.Cir.1993). Second, the accused infringer or declaratory plaintiff "must have actually produced or prepared to produce an allegedly infringing product." *Level 1 Technologies, Inc. v. C.R. Bard, Inc.,* 839 F.Supp. at 91. It is the former subpart that is at issue in this case.

■ The test for determining a reasonable apprehension of suit is an objective one, based on the totality of the circumstances in the absence of an explicit threat. *BP Chemicals Limited v. Union Carbide Corporation,* 4 F.3d at 978; *Shell Oil Company v. Amoco Corporation,* 970 F.2d at 888–889. The examination primarily turns on the conduct of the patentee, HP, and whether HP's conduct sufficiently indicates an intent to enforce the '660 patent. *BP Chemicals Limited v. Union Carbide Corporation,* 4 F.3d at 978; *Shell Oil Company v. Amoco Corporation,* 970 F.2d at 888. Finally, GenRad bears the burden of showing by a preponderance of the evidence that it has a reasonable apprehension of being sued. *Shell Oil Company v. Amoco Corporation,* 970 F.2d at 887; *Spectronics Corporation v. H.B. Fuller Company, Inc.,* 940 F.2d at 635.

■ In the case at bar, HP provided GenRad with assurances in its April 1994 letter and at the June 29, 1994 hearing that it would not sue GenRad for infringement of the '660 patent with respect to GenRad's former version of Opens Xpress, i.e., the version generally and incompletely described in the brochure appended to the April 1994 letter. Objectively, although directed to "any product," HP's conduct in the fall of 1993 and its threats of "dire consequences" pertained to the version of Opens Xpress which GenRad intended to introduce at that time.

It is true that HP shows no hesitancy in using the legal system to enforce its rights. HP also refuses to provide GenRad with further assurances pertaining to GenRad's current version of Opens Xpress and future improvements thereto. *See BP Chemicals Limited v. Union Carbide Corporation,* 4 F.3d at 980. GenRad's President and Chief Executive Officer is therefore understandably concerned that HP will bring an infringement action in the future based on the '660 patent. (Docket Entry # 15, Ex. D).

■ The possibility of future litigation, however, is not sufficient to establish an actual controversy. *Level 1 Technologies, Inc. v. C.R. Bard, Inc.,* 839 F.Supp. at 91–92. HP's assurances diminish the effect of its conduct at the September 21, 1993 meeting. GenRad fails to meet its burden. Hence, as was done in the second Massachusetts action, this court will dismiss GenRad's first counterclaim to the extent it pertains to the '660 patent.

III. *MOTION BY PLAINTIFF HEW-LETT–PACKARD UNDER FEDERAL RULE 42(b) FOR A SEPARATE TRIAL, IF NECESSARY, ON THE ANTITRUST, UNFAIR COMPETITION AND PATENT MISUSE ISSUES AND TO STAY DISCOVERY OF THESE ISSUES (DOCKET ENTRY # 11); MOTION BY DEFENDANT, GENRAD, INC., UNDER FEDERAL RULE 42(b) FOR A SEPARATE TRIAL ON THE ISSUE OF DAMAGES AND TO STAY DISCOVERY CONCERNING DAMAGES, PENDING THE ADJUDICATION OF LIABILITY (DOCKET ENTRY # 55)*

■ The parties in this complex patent/antitrust action seek to stay discovery

and to have separate trials on various issues. GenRad moves for a separate trial on the issues of damages and liability and further moves to stay discovery concerning damages pending a determination of liability. (Docket Entry # 55). HP moves to separate the '953 patent issues from the antitrust and unfair competition issues.[19] (Docket Entry # 11). This court first addresses the latter motion.

HP argues that GenRad's antitrust counterclaim (second counterclaim), its unfair competition counterclaim (third counterclaim) and its defense based on estoppel due to HP's alleged use of the '953 patent for unlawful and anticompetitive purposes (third affirmative defense) all rely on proof that HP committed inequitable conduct in procuring the '953 patent. Accordingly, resolution of the inequitable conduct issue may obviate the need for discovery and trial on the antitrust and unfair competition issues. (Docket Entry # # 12 & 35).

Rule 42(b), Fed.R.Civ.P., governs this court's decision to conduct separate trials. The rule provides, in pertinent part that, "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial." Rule 42(b), Fed.R.Civ.P.

The decision to bifurcate "is committed to the sound discretion of the court." *Data General v. Grumman Systems Support Corporation*, 795 F.Supp. 501, 503 (D.Mass. 1992), *affirmed*, 36 F.3d 1147 (1st Cir.1994). In making this determination on a case by case basis, *Laitram Corporation v. Hewlett–Packard Company*, 791 F.Supp. 113, 114 (E.D.La.1992) (court makes bifurcation decision on "case-by-case basis"), "the major consideration is directed toward the choice most likely to result in a just final disposition of the litigation." *In Re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed.Cir.1986). Prejudice is also a major component of assessing whether to order separate trials. *Laitram Corporation v. Hewlett–Packard Company*, 791 F.Supp. at 115; *see also Lisa v. Fournier Marine Corporation*, 866 F.2d 530, 531 (1st Cir.), *cert. denied*, 493 U.S. 819, 110 S.Ct. 75, 107 L.Ed.2d 41 (1989) (noting appellant's failure to show material prejudice).

While the movant generally bears the burden of establishing the necessity for separate trials and the resulting prejudice of conducting a single trial, 5 James William Moore, Jo Desha Lucas & Jeremy C. Wicker *Moore's Federal Practice* ¶ 42.03[1] (1994) (collecting cases at footnote five), courts often separate patent issues from antitrust counterclaim issues. *See In Re Innotron Diagnostics*, 800 F.2d at 1084 (noting that lower court cited cases which reflect "the now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim"); *Brandt, Inc. v. Crane*, 97 F.R.D. 707, 708 (N.D.Ill.1983) (separate trials of patent and antitrust issues furthers convenience, expedience and economy as "a general rule").

HP persuasively demonstrates that it is more expeditious and convenient to try the less complex, dependent patent validity and inequitable conduct issues before addressing the antitrust and unfair competition issues. The second and third counterclaims and third affirmative defense appear predicated on HP's alleged inequitable conduct and failure to disclose certain prior art to the PTO during the prosecution of the '953 patent and its predecessor, in part, the '660 patent. A failure to prove inequitable conduct may eliminate the need to determine the antitrust counterclaim, *see FMC Corporation v. Manitowoc Company, Inc.*, 835 F.2d 1411, 1417 (Fed.Cir.1987); *United States Gypsum Company v. National Gypsum Company*, 1994 WL 74989 at *2 (N.D.Ill. March 10, 1994) ("should the patents be found valid and enforceable in the patent trial, a motion for a directed verdict on the Defendant's Walker Process counterclaims may be in order"), and the unfair competition counterclaim, *see FMC Corporation v. Manitowoc Company, Inc.*, 835 F.2d at 1418. Nor will separately trying GenRad's "patent type" antitrust claim prejudice GenRad. In the event Gen-

---

**19.** After conducting a hearing on GenRad's motion for a separate trial, this court took the motion (Docket Entry # 55) under advisement. Although GenRad seeks oral argument on HP's motion for a separate trial (Docket Entry # 16, p. 10) in accordance with LR. 7.1(D), this court deems such argument unnecessary.

Rad succeeds in establishing HP's inequitable conduct,[20] "it need not again prove the same issues at the antitrust trial." *In Re Innotron Diagnostics,* 800 F.2d at 1085.

Antitrust issues are complex and, particularly with respect to damages, raise different issues and proof. Bifurcation therefore serves the interest of avoiding jury confusion.

In exercise of this court's discretion, therefore, it is advisable to separate the trial and the discovery of the patent issues from the antitrust and unfair competition issues set forth in the second and third counterclaims and the third affirmative defense.

Turning to the issue of bifurcating damages from liability in the patent trial, HP argues that conducting separate trials will be prejudicial. In the event of the need for a second trial, conducting two separate trials increases the cost due to having two jury pools and two separate juries. The issue of liability inevitably leads to the issue of damages. Bifurcation is ordinarily the exception and not the rule. *See, e.g., Laitram Corporation v. Hewlett–Packard Company,* 791 F.Supp. at 114.

On the other hand, ordering separate trials would eliminate discovery on damages in the event the jury finds in GenRad's favor. Discovery is presently set to close on April 21, 1995, with trial to commence on May 15, 1995. Liability is a distinct and separate issue from damages. Admittedly, calculating damages is likely to be difficult and complex. There is no indication that a jury cannot decipher two complex issues simultaneously.

Separating liability from damages will further delay a final resolution of this litigation. In its discretion, this court will therefore conduct a single trial on the issues of patent liability and damages.[21] Depending on this court's trial calendar, this court anticipates that it will conduct a trial on the antitrust and unfair competition issues, if necessary, within five months after the jury decision as to patent liability.

---

**20.** GenRad's first affirmative defense raises the fraud and inequitable conduct issues all of which GenRad may seek to establish at the patent trial.

**21.** GenRad may, however, wish to conduct the trial in two phases with two verdicts by submitting a motion to this effect. Using the same jury,

## CONCLUSION

In accordance with the foregoing discussion, HP's motion for a preliminary injunction (Docket Entry # 20) is **DENIED** and its motion to dismiss (Docket Entry # 7) is **ALLOWED**. GenRad's motion for a separate trial and a stay of discovery (Docket Entry # 55) is **DENIED**. HP's motion for a separate trial and a stay of discovery (Docket Entry # 11) is **ALLOWED**. This court will proceed to trial on the patent liability and damages issues on May 15, 1995. Thereafter, if necessary, this court will conduct a separate trial on the antitrust and unfair competition issues to be concluded, depending on this court's trial calendar, within five months after the jury decides the patent liability and damages issues.

the jury would initially hear evidence and issue a special verdict as to patent liability. In the event the jury determines the matter in GenRad's favor, then the jury would proceed to phase two and hear evidence as to damages.